

**United States District Court**

**For the Northern District of Texas**

**Dallas Division**

**(Jury Action)**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

SEP - 7 2007

CLERK, U.S. DISTRICT COURT

By _____
        Deputy

Alfred Adask, *sui juris*, plaintiff                          }

                                                              }

                                                              }

                                                              } Civil Action No._____

v                                                             }  **307 - CV1531-P**

                                                              }

Debra Anne Adask (nee Bertke), Joanne Martin                 }

Descher, Timothy J. Patterson, Mark T. Stoll,                }

Michelle Wilson, R.D. Menefee, Stephen Vighi,                }

William Wegge Jr., Anthony Manansala and John                }

Does 1 through 10, Defendants                                 }

## COMPLAINT

"Allegations such as those asserted by petitioner (a pro se litigant), however inartfully pleaded, are sufficient to call for the opportunity to offer supporting evidence." *Haines v Kerner* 404 U.S. 519, 522.  Comes now, Plaintiff Alfred Adask (a/k/a "ALFRED ADASK"), *in propria persona*, and only in the political status of a Sovereign, a joint tenant in the Sovereignty, hereinafter "I", *Chislom v Georgia* 2 U.S. 419 (A.D. 1793), and beneficiary of the charitable trusts styled "The Constitution of The State of Texas" and "The Constitution of The State of Texas" and alleges against Defendants, Debra Ann Adask (formerly Debra Ann Bertke), Joanne Martin Descher, Timothy J. Patterson, Mark T. Stoll, Michelle Wilson, R.D. Menefee, Stephen Vighi, William Wegge Jr., Anthony Manansala and John Does,1 through 10, as follows:

JURISDICTION AND VENUE

1.     This suit is of civil nature at common law or equity; it is a controversy between Plaintiff, Alfred Adask, and Defendants who are residents, citizens and/or legal subdivisons of the STATE OF TEXAS, a federal territorial state/administrative district, and/or Defendants which are residents and citizens of the STATE OF MISSOURI, a federal territorial state or alternatively one of the several States of the Union, and/or defendants whose residence is not yet known. There is diversity of citizenship between plaintiff and all of the defendants and the matter in controversy is in excess of $200,000.00. This court has jurisdiction pursuant to 36 Stat. 1087 et. seq. Section 24 First, as a controversy between a Citizen of a State and a foreign State, citizens or subjects or alternatively as a controversy between citizens of different States; and also this court has jurisdiction as a controversy arising under Article III of the Constitution or laws of the United States or treaty made under that authority. Alternatively, this court has jurisdiction pursuant to the Foreign Sovereign Immunities Act (hereinafter also "FSIA"), 28 U.S.C. § 1330, §§ 1602-1611; and 28 U.S.C. § 1331, and/or 18 U.S.C. § 1595, "Civil remedy". Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act of 1970 ("'RICO") 18 U.S.C. §§ 1961 through 1968, and for damages against Defendants Debra Ann Adask, Descher, Stoll, Wilson, Menefee, Vighi, Wegge Jr, and Manansala and Does 1 through 10 for violations of RICO, false imprisonment, involuntary servitude, deprivation of Liberty, fraud, and torture. Alfred Adask also is seeking to recover his attorneys' fees, if any, and other costs incurred in this lawsuit.

2.     This court has jurisdiction over this action pursuant to 18 U.S.C. §§ 1964(c), 1965(a) .. (b), 28 U.S.C. §§ 1331, 1337, and pursuant to principles of ancillary and pendent jurisdiction; and pursuant to 28 U.S.C. 1331 ("Federal Question"); and 28 U.S.C. 1332 ("diversity of citizenship").  I recognize the judge of the within-captioned Court to exist as a judge with capacity of fiduciary under the charitable trust styled "The Constitution of the United States" for the express benefit of the Sovereignty and for my benefit as a man and Sovereign entitled as a beneficiary of said trusts to make claims for the execution of said trusts.  I rely upon

the Oath required at Article 6 Section 3 of The Constitution of The United States of America as
an expressed promise "to support this Constitution" through which the matters herein ought to be
judicially considered.

3.     There is an actual, justiciable controversy between Alfred Adask and the
Defendants.

4.     Venue is proper in this judicial district because the causes of action arise in this
judicial district of The United States of America.

5.     In connection with the acts alleged in this Complaint, Defendants, directly or
indirectly, used the means and instrumentalities of interstate commerce, including the United
States mails and/or wire transmissions in interstate commerce. Defendants are engaged in
interstate commerce and foreign commerce and in activities which affect interstate commerce.

## THE PARTIES

6.     Alfred Adask is a living, spiritual man who is: self-evidently endowed by his
Creator YHWH with certain unalienable Rights, among which are Life, Liberty and the pursuit
of Happiness.  I am entitled to make this claim and complaint as: a beneficiary of The
Constitution of The State of Texas and the laws pursuant thereto; a beneficiary of The
Constitution of The United States of America and the laws pursuant thereto; and a citizen of The
United States of America.  At all times relevant to this complaint, I was and am domiciled
Domiciled near N32°57.51816, W096°40.33212 within the exterior boundaries of The State of
Texas—a member-State of the perpetual Union styled "The United States of America". Alfred
Adask is entitled to make this complaint as a sovereign pursuant *Genesis* 1:26-28, *The
unanimous Declaration of the thirteen united States of America* of July 4th, A.D. 1776, and the
*Peace Treaty of Paris* of A.D. 1783.  Plaintiff is not resident of STATE OF TEXAS, acts at all
times relevant to the matters in this complaint "at arm's length," and is not an employee of any
government, governmental agency or other employer.  Plaintiff has sovereign immunity from

enforcement of special laws and police regulations, See <u>Scott v. Sanford. 60 U.S. 393</u> at 416-417; and alternatively, or in conjunction with, 28 U.S.C. § 1604 is immune from the jurisdiction of the courts of the United States and the States.

7.      Debra Ann Adask (formerly Debra Ann Bertke) is a woman who was at some times relevant to this complaint was a resident of STATE OF TEXAS and is currently a resident of the STATE OF MISSOURI.

8.      Joanne Martin Descher is a woman who was employed as attorney by Debra Ann Adask and was at all times relevant to this complaint was resident of STATE OF MISSOURI.

9.      Timothy J. Patterson is a man who, at all times relevant to this complaint, was employed by JEFFERSON COUNTY, MISSOURI and is resident of STATE OF MISSOURI.

10.      Mark T. Stoll is a man who was at all times relevant to this complaint employed by JEFFERSON COUNTY, MISSOURI and is resident of STATE OF MISSOURI.

11.      Michelle Wilson, is a woman who was at all times relevant to this complaint employed with badge number # 760 by CITY OF CARROLLTON, TEXAS and resident of STATE OF TEXAS.

12.  R.D. Menefee is a man who was at all times relevant to this complaint employed with badge # 314 by CITY OF CARROLLTON, TEXAS and resident of STATE OF TEXAS.

13.  Stephen Vighi is a man who was at all times relevant to this complaint employed by the Public Defenders Office of JEFFERSON COUNTY, MISSOURI and resident of STATE OF MISSOURI.

14.  William Wegge, Jr. is a man who was at all times relevant to this complaint employed by JEFFERSON COUNTY, MISSOURI and resident of STATE OF MISSOURI.

15A. Anthony "Tony" Manansala is a man who was at all times relevant to this complaint employed by the Public Defenders Office of JEFFERSON COUNTY, MISSOURI and resident of STATE OF MISSOURI.

15B. 1 through 10 "John Does" are additional party-defendant whose names, residency and/or citizenship remain to be discovered.

## STATEMENT OF MATERIAL FACTS

16A. "At the revolution, the Sovereignty devolved on the people; and they are truly the Sovereigns of the country, but they are Sovereigns without subjects and have none to govern but themselves; the citizens of America are equal as fellow citizens and as joint tenants in the Sovereignty." *Chisolm v. Georgia*, 2 U.S. 419, 2 Dall. 419 1L.Ed 440 (A.D. 1793).

16B. The *Chisholm* court *supra* clearly held that the Sovereignty forms the source of the authority for the Peoples Constitutional Government; said authority clearly is held by the Sovereign People; this form of Sovereignty is in opposition to the idea of a "Sovereign State" as expressed by a circuit court as follows:

> "Sovereign state" are cabalistic words, not understood by the disciple of liberty, who has been instructed in our constitutional schools. It is an appropriate phase when applied to an absolute despotism. I firmly believe, that the idea of sovereign power in the government of a republic is not compatible with the existence and permanent foundation of civil liberty, and the rights of property. The history of man in all ages has shown the necessity of the strongest checks upon power, whether it be exercised by one man, a few or many. Our revolution broke up the foundations of sovereignty in government; and our written constitutions have carefully guarded against the baneful influence of such an idea henceforth and forever. I can not therefore recognize the appeal to the sovereignty of the state, as a justification of the act on question." *Doe ex dem. Gaines et al. v. Buford,* Campbell County Circuit Court, (A.D. 1825) [Monroe, T.B. 1824-1828, e.g. 17 Ky. (1 T.B. Mon.)]

16C. "Sovereigns have not abandoned their sovereign powers simply because they have not expressly reserved them through a contract. To presume that a Sovereign forever waives the

right to exercise one of his or her powers unless it expressly reserves the right to exercise that power in a commercial agreement turns the concept of sovereignty on its head. [See: MERRION et al.. d.b.a. MERRION & BAYLESS. et al. vs. Jicarilla Apache Tribe et al., 455 U.S. 130 (A.D. 1982), 102 S. Ct. 894, 71 L. Ed. 2d 21].

16D.  "The terms 'sovereign power of a state' are often used, without any very definite idea of their meaning, and they are often misapplied ... The sovereignty of a state does not reside in the persons who fill the different departments of its government; but in the people from whom the government emanated, and who may change it at their discretion. Sovereignty then, in this country, abides with constituency and not with the agent. And this remark is true, both in reference to the federal and state governments." Spooner v McConnell. et al., I McClean 337, (A.D. 1838) 22 Fed. Cas. 939, 943.

16E.  Plaintiff expressly relies upon the Foreign Sovereign Immunities Act. I have no memory of any conduct, act, deed, use (trust or implied trust) in any capacity outside of a "foreign state" as defined at 28 USC § 1603 (a). I claim and retain at all times material "the presumption of a foreign sovereign and immunity to the State's courts.

17A.   On or about July 1st, A.D. 1993, Alfred Adask moved into his domicile of choice (hereafter, "domicile") located at 2203B Woodcreek, The City of Carrollton, The County of Dallas, The State of Texas, The United States of America and remained domiciled therein until he was removed under force of arms and without warrant on or about September 30th, A.D. 2002.

17B.   At all times while Plaintiff dwelled at his domicile, Plaintiff used rooms in house at said domicile as offices to exercise his right to publish his news magazine as secured by the 1st Amendment to The Constitution of The United States of America and Article 1 Section 8 of The Constitution of The State of Texas.

18.    At most times while Plaintiff lived at his domicile, Plaintiff exercised his right of free speech under said 1st Amendment and Article 1 Section 8 to broadcast a news radio program from within said domicile.

19.     On or about October 1st, A.D. 1995, Debra Ann Bertke ("Bertke") lost her residence located within DALLAS COUNTY, TX due to foreclosure.

20.     On or about October 1st, A.D. 1995, Bertke moved into the home that was Plaintiff's domicile.

21.     Bertke is a devout member of the Catholic faith.

22.     Plaintiff is a Protestant Christian.

23.     On or about October, A.D. 1995, representatives of the Catholic Church declared that they could not marry Bertke to Plaintiff because Plaintiff had been previously married and divorced.

24.     On or about December 3rd, A.D. 1995, Bertke and Plaintiff participated in a common law marriage ceremony held on the soil within the boundaries of The State of Texas.

25.     Bertke was prevented by her Catholic faith from consenting to being married to Plaintiff in common law ceremony that was not sanctioned by the Catholic church.

26.     On or about December 24th, A.D. 1995, Bertke gave birth at Plaintiff's domicile to a female child who was named "Alexandra Nicole Adask".

27.     On or about January 10th, A.D. 1996-no more than two weeks after the baby's birth—Bertke began to threaten to "just take the baby and leave".

28.     On or about April, A.D. 1996-approximately six months after the common law marriage ceremony-Bertke renewed her Texas Drivers License in the name "DEBRA A BERTKE".

29.     On or about April, A.D. 1996, Bertke expressly showed her new Texas Drivers License with name "BERTKE" to Plaintiff to prove that she did not regard herself as married to Plaintiff.

30.     On or about June, A.D. 1996, Bertke took the baby Alexandra and moved from Plaintiff's domicile within The County of Dallas, The State of Texas into a residence located in DENTON COUNTY, TEXAS.

31.     On or about January, A.D. 1998, Bertke and baby Alexandra moved from their residence in DENTON COUNTY, TEXAS to Bertke's mother's residence located in or near JEFFERSON COUNTY, MISSOURI.

32.     Texas law allows two years from the date of separation to enforce any duties that might by incurred by means of a common law marriage.

33.     Debra Anne Bertke neglected to enforce any alleged duties upon Plaintiff within the STATE OF TEXAS two-year statute of limitations for common law marriages.

35.     On or about September, A.D. 2000, Debra Anne Bertke and her attorney, Ms. Joanne Martin Descher ("Descher"), devised a scheme and did conspire for the purpose of subjecting Plaintiff to the involuntary servitude of paying child support without legal obligation to do so. In this scheme, and upon advice of her attorney Descher, Bertke did falsely and fraudulently allege that she had, in fact, consented to be married to Plaintiff by means of the common law marriage ceremony of A.D. 1995; that she was still married to Plaintiff; that she now wanted a divorce; that the courts of MISSOURI had subject matter jurisdiction over an alleged divorce proceeding between Bertke and Plaintiff; and that, given jurisdiction over the alleged divorce (based on fraudulent claim of marriage), the MISSOURI court could then exercise (fraud-based) jurisdiction to order Plaintiff to pay child support.

36.     On or about March 2nd, A.D. 2001, Bertke and attorney Descher, executed said scheme in a fraud-based divorce proceeding against Plaintiff IN THE CIRCUIT COURT OF MISSOURI, JEFFERSON COUNTY, DIVISON ONE, in the case of DEBRA ANN BERTKE v ALFRED NORMAN ADASK (CV300-3086-DR-J1). [Note that the purported divorce action, almost five years after the purported common law marriage, is styled "BERTKE" (maiden name) vs. "ADASK".]

37.     It was unreasonable for any judge to suppose, without evidence, that a woman sur-named "Bertke" in A.D. 2001 was in fact married in A.D. 1995 to a man sur-named "Adask".

38.     Nevertheless, in said divorce proceeding, purported "judge" Timothy J. Patterson ("Patterson") decreed a divorce, ordered Plaintiff to pay child support, and ordered that Bertke's name be legally changed to Debra Anne Adask. [I.e., Bertke did not take Plaintiff's family name in the context of the alleged common law marriage in A.D. 1995; she first took Plaintiff's family name in the context of the fraudulent divorce proceeding in A.D. 2001.]

39.     It was unreasonable for Patterson to presume Bertke's claim of marriage was credible if she hadn't taken this Plaintiff's sur-name "Adask" during the five years of purported marriage, but did take Plaintiff's sur-name in the context of the divorce.

40.     Plaintiff, Alfred Adask, was not served with process for the alleged divorce proceeding.

41.     Plaintiff, Alfred Adask, was not present in the MISSOURI court for the alleged divorce proceeding.

42.     Plaintiff, Alfred Adask, was not given notice and opportunity to be heard at the alleged divorce proceeding.

43.     In the transcript of the alleged divorce proceeding, attorney Descher admitted that Plaintiff had not been served in this matter but falsely claimed that service had been attempted and was valid because Plaintiff had refused to accept service.

44.     So far as I know, service was never attempted at my domicile while I was present; I never refused to accept service.

45.     Under MISSOURI law, the court does not obtain *in personam* jurisdiction over a defendant unless the defendant has been served.

46.     It was unreasonable for Patterson, a trained attorney and purported judge, to

believe he had *in personam* jurisdiction to proceed in a matter where he knew that the alleged defendant had not been served.

47.     Knowing that this Plaintiff had not been served, court still allowed the "divorce" action to proceed.

48.     Questioned during said divorce proceeding by her attorney, Bertke testified, in part, as follows:

> Q:  Were the two of you married in a common law ceremony in Texas on December 3, 1995?
>
> A:  Yes, we were.
>
> Q:  And that marriage is <u>not registered anywhere</u>; is that correct?
>
> A:  <u>Correct</u>.
>
> Q:  You were never married in a civil ceremony in the State of Missouri?
>
> A:  No. [Emphasis added.]

49.     It was unreasonable for the COURT to find that a common law marriage or marriage relationship existed for over five years between Debra Ann Bertke and Plaintiff based on no evidence other than the single witness of Bertke's testimony.

50.     During said divorce proceedings, attorney Descher and the COURT stated as follows:

"THE COURT:  I need for you to give me the statute or whatever the case is in the State of Texas.  First of all, <u>there's a question of whether you had a marriage in the first place</u>.  And then, if there is a marriage, do I have grounds under Missouri law to either annul it or then to just grant a divorce.

. . . .

"MS DESCHER:  Under Missouri law.  And there is very little case law that I could find on this question, but because <u>Missouri does not recognize common law marriage</u>, I believed it to be appropriate to do the annulment as opposed to the dissolution." [Emphasis added.]

51.     Revised Statute of Missouri (RSMo) 451.040 declared that the courts of MISSOURI could not recognize common law marriages.

52.     It was unreasonable and unlawful for Patterson—who expressed doubt that any marriage had actually occurred—to nevertheless suppose he had subject matter jurisdiction to grant either a divorce or annulment in the matter of an "common law marriage" whose very existence was doubtful when Patterson knew that MISSOURI law did not even recognize common law marriages.

53.     Patterson lacked subject matter jurisdiction to rightfully issue a divorce or annulment or child support order based on the alleged "common law marriage".

54.     During said divorce proceedings, Patterson justified recognizing the alleged common law marriage by declaring, "And, of course, I'm supposed to give full faith and credit to Texas, whatever their law may be down there."

55.     Article 4 Section 1 of The Constitution of The United States of America declares in part,  "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."

56.     Bertke admitted in her testimony that the alleged common law marriage was "not registered anywhere"; i.e., there were and are no "public Acts, Records, and judicial Proceedings" from The State of Texas or any other state to which Patterson could extend "full faith and credit".

57.     Patterson's claim of "full faith and credit" based on nonexistent records violated due process.

58.     It was unreasonable and unlawful for Patterson to assume subject matter jurisdiction over the alleged common law marriage performed within The State of Texas under the "full faith and credit clause" of the federal Constitution.

59.     "A judgment is void if the 'court that rendered judgment lacked jurisdiction of the subject matter, or of the parties, or acted in a manner inconsistent with due process.'" *K&K Investments, Inc. v McCoy*, 875 S.W. 2d 593, 596 (Mo. App. 1994).

60.     Mr. Patterson's order in the matter of CV300-3086-DR-J1 granting a divorce and ordering Plaintiff to pay child support was void for lack of *in personam* jurisdiction over Alfred Adask, lack of subject matter jurisdiction over an alleged "common law marriage," and violation of due process by justifying a claim of subject matter jurisdiction on "full faith and credit" accorded to non-existent records.

61.     Under MISSOURI law RSMo 451.010, lawful marriage requires the "mutual consent" of both parties.

62.     I deny that both Plaintiff and Bertke "mutually consented" to the alleged common law marriage of A.D. 1995; I deny that any such common law marriage did, in fact, take place.

63.     In A.D. 1995 and A.D. 1996, Bertke expressly denied having consented to a common law marriage to Plaintiff and manifested that denial by renewing her Texas Drivers License in her maiden name "BERTKE".

64.     It is not merely unreasonable, it is bizarre to suppose that Patterson—who granted a name change to Bertke from "Bertke" to Plaintiff's family name "Adask" in the context of the alleged annulment from Plaintiff in A.D. 2001--could truly believe that Adask and Bertke had, in fact, both "mutually consented" to the alleged common law marriage of A.D. 1995.

65.     By finding and/or construing a common law marriage to have existed between Plaintiff and Bertke, Mr. Patterson thus entered into the existing conspiracy between Bertke and her attorney Descher to subject Plaintiff to involuntary servitude.

66.     On or about September 13th, A.D. 2002, Debra Adask (nee, Bertke) Bertke) filed a sworn, single-witness "COMPLAINT IN FELONY AND REQUEST FOR WARRANT" against "ALFRED NORMAN ADASK" with the Prosecuting Attorney of the County of Jefferson, State of Missouri for two felony counts of criminal nonsupport of a child, each count to carry a maximum penalty of five years in prison.

67.     At no point in said "COMPLAINT IN FELONY," did affiant Debra Adask (nee Bertke) allege that Plaintiff had ever been within boundaries of The State of Missouri and/or that Plaintiff had ever been charged with a crime and/or "fled" from within The State of Missouri to The State of Texas.

68.     In said "COMPLAINT IN FELONY," affiant Debra Adask swore that Plaintiff Alfred Adask "knowingly failed to provide, without good cause, adequate support for ANA, the defendant's child for whom the defendant was legally obligated to provide such support" [emphasis added] even though Debra Adask knew or had reason to know that the child support decree against Alfred Adask was void based on a) her and her attorney's conspiracy to defraud Plaintiff and subject him to involuntary servitude, b) Debra Bertke's/Adask's fraudulent claim of a common law marriage to Alfred Adask; c) failure to serve Alfred Adask in the matter of CV300-3086; and d) that Alfred Adask had not voluntarily assumed the fiduciary obligation of paying child support—i.e., there was no legal obligation for Plaintiff to pay child support.

69.     On or about September 13th, A.D. 2002, without probable cause, Michael G Ravetta, Assistant Prosecting Attorney attached a two sentence verification of Debra Adask's "COMPLAINT IN FELONY" wherein Mr. Ravetta declared, "The prosecuting Attorney of the County of Jefferson, State of Missouri has reviewed the foregoing charges and approves the form of this charging document.  Further, the State prays that the court issue a warrant for the defendant's arrest pursuant to Missouri Supreme Court Rule 22.03."  [Emphasis added.]

70.     On or about September 18th, A.D. 2002, JEFFERSON COUNTY alleged "associate justice" Mark T. Stoll issued an alleged "WARRANT FOR ARREST" for "ALFRED N. ADASK WHOSE ADDRESS IS 2203 WOODCREEK, CARROLLTON, TX, 75006" with "RACE: WHITE," "WGT: 155," "DOB: 4/21/45" and "SSN: ###-##-####"; whose offenses

were allegedly "committed within the jurisdiction of this court and in violation of the laws of the State of Missouri."

71.     Said WARRANT was facially defective since Plaintiff's 1) proper name is Alfred Adask; 2) domicile of choice was located at 2203B Woodcreek, The City of Carrollton, The State of Texas, The United States of America; weight was approximately 190 pounds; date of live birth on the soil within boundaries of The United States of America was April 24th, A.D. 1945.  Plaintiff denies that he had a "SSN: ###-##-####"; Plaintiff denies that he had ever committed any act whatever "within the jurisdiction of this court" or "against the laws of the State of Missouri".

72.     Stoll knew or had reason to know that a) Plaintiff was outside the limits of JEFFERSON COUNTY; b) Plaintiff was outside the geographical and jurisdiction limits of The State of Missouri; c) there was no evidence or even false allegation that Plaintiff had ever been within the jurisdictions of JEFFERSON COUNTY or The State of Missouri; d) there was no evidence or even false allegation that Plaintiff had "fled" from within the boundaries of The State of Missouri; and e) that because there was only one alleged witness against Alfred Adask, and the Debra Adask complaint was verified only as to "form," there was at most reasonable suspicion, but no probable cause to charge Plaintiff with any crime.

73.     It is unreasonable to suppose that Stoll, a licensed attorney and alleged "associate justice" of JEFFERSON COUNTY, did not know that he had no authority to issue a alleged "WARRANT" for the "extradition" and subsequent arrest of a man living within another State of the Union, who had not fled from within the boundaries of The State of Missouri, based on the mere complaint of single witness, verified only as to "form".

74.     By issuing said alleged "WARRANT" for Plaintiff's extradition—when Plaintiff had not been charged with a crime or fled from within The State of Missouri—Stoll entered into the pre-existing conspiracy to deprive Plaintiff of his liberty, subject Plaintiff to involuntary servitude, and extradite and/or kidnap Plaintiff as a virtual "slave" based on a mere "Claim" of the alleged private "Party" (Bertke-Adask) to whom "such Service or Labour may be due," under Article 4 Section 2 Clause 3 rather than as a man charged with a crime under Article 4 Section 2

Clause 2 of The Constitution of The United States of America.

75.     On or about September 30th, A.D. 2002, at approximately 10:00 AM, two armed employees of the CITY OF CARROLLTON, TEXAS approached my domicile with a "teletype" sent to them by means of electronic wire from JEFFERSON COUNTY, MISSOURI instructing them to arrest "ALFRED N. ADASK, DOB 4/21/45," Weight 180, and no Social Security Number-for two felony counts of non-support of a child—and knocked at the door to my domicile.

76.     My proper name is "Alfred Adask".

77.     I deny that "4/21/45" is my Date of Birth.

78.     At the time of my arrest, my weight was approximately 190 pounds and had been for several years.

79.     My assistant in publishing the news magazine and in producing the news radio talk show, Jeff Penley (hereinafter "Penley") was present in his office at my domicile when the CARROLLTON employees knocked on the door; Penley talked to the employees through a window and agreed to step outside the door to my domicile to talk further.

80.     At that time, Penley was 17 years younger than Plaintiff, six inches shorter, and 50 pounds heavier. (I.e, Penley and Plaintiff looked as much alike as a bowling ball and a bowling pin.)

81.     Penley stepped outside the door to my domicile, closed the door to said domicile behind him, began talking to the two armed CARROLLTON employees and was subsequently arrested and handcuffed by the two CARROLLTON employees on the mistaken belief that he was the "ALFRED N ADASK" they sought to arrest.

82.     The 4th Amendment to the Constitution of The United States of America declares, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue,

but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." [Emphasis added.]

83. Article 1 Section 9 of The Constitution of The State of Texas declares, "The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation." [Emphasis added.]

84. Article 1 Section 15 of The Constitution of The State of Missouri declares, "That the people shall be secure in their person, papers, homes and effects, from unreasonable searches and seizures; and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the person or thing to be seized, as nearly as may be; nor without probable cause, supported by written oath or affirmation." [Emphasis added.]

85. It is unreasonable to suppose that Penley—whose age and physical appearance were dramatically different from Plaintiff's—should be arrested as if he were "ALFRED N ADASK".

86. It was unreasonable for the two armed CARROLLTON employees to open the door to my domicile, enter despite Jeff Penley's express denial of permission to do so, without a warrant and without exigent circumstances.

87. I emerged from the bathroom and was shocked to see two armed CARROLLTON employees searching my domicile, and Penley sitting handcuffed on my living room couch.

88. I demanded to see their warrant to enter or search my domicile and to arrest anyone.

89. The CARROLLTON employees showed me their "teletype".

90. I pointed out the errors on the teletype as to name, DOB, weight and address and demanded to see a warrant.

91.     The two CARROLLTON employees began to realize they had improperly arrested Penley and that Plaintiff was probably their true target.

92.     The two CARROLLTON employees assured me that there was a warrant at their police headquarters which they would provide if I would consent to go with them to said headquarters.

93.     I refused to consent to leave my domicile without first seeing a true warrant for my arrest that conformed to constitutional requirements.

94.     The two CARROLLTON employees released Penley from the handcuffs.

95.     I continued to demand to see a constitutional warrant.

96.     I notified the two armed CARROLLTON employees that I denied that "ALFRED N ADASK" was my proper name and that I denied that I was fiduciary for said "ALFRED N ADASK" or any other person or entity associated with this matter.

97.     One of the two armed CARROLLTON employees called their employer's headquarters by means of telephone, explained the situation and asked for instructions.

98.     I heard that CARROLLTON employee say that the Officer In Charge would soon bring the warrant for my arrest to my domicile from their headquarters.

99.     We waited between five and ten minutes until the Officer In Charge came to door of my domicile, opened the door, stepped inside my domicile, and I heard him angrily announce that there was no warrant, but that I was under arrest anyway, and then order the other two CARROLLTON employees to arrest me.  The Officer In Charge then left my domicile.

100.    At approximately 11:00 AM, the two armed CARROLLTON employees handcuffed me against my will and without my consent, removed me without probable cause from my domicile without my consent, and transported me by means of motor vehicle and against my consent to the CARROLLTON CITY JAIL where Plaintiff was photographed and

fingerprinted without my consent, and placed into a holding cell—without warrant or probable cause.

101.   I again demanded to see a constitutional warrant for my arrest, and the employees at the jail produced another copy of the erroneous "teletype".

102.   At approximately 1:30 PM, another CARROLLTON employee removed me from the holding cell, handcuffed me against my will and transported me by means of motor vehicle and against my will to the DALLAS COUNTY, TEXAS jail (a/k/a/ "Lew Sterrit Jail").

103.   Plaintiff arrived at the DALLAS COUNTY jail at approximately 3:00 PM and complained to the large, black booking employee who was approximately 30 years old, that Plaintiff had been unlawfully arrested without warrant; that employee merely sneered and said, "This is Lew Sterrit, and that rights shit doesn't work here."

104.   I thought DALLAS COUNTY had gone mad; until that moment, I didn't believe that a man could be arrested within The United States of America without a warrant; I was even more shocked to see a young black man tell me that "that rights shit doesn't work" in the DALLAS COUNTY jail since that young man's parents and grandparents had almost certainly supported the Civil Rights Movement of the 1960s and Dr. Martin Luther King's crusade to make sure that that "rights shit" worked everywhere, every time, for everyone. (As I came to learn, that young black man was the only honest person I met in 344 days of false imprisonment.  Truly, that "rights shit" did not work with any of the police, jailers, districts attorneys, sheriffs, public defenders, and even judges who have handled my case.)

105.   I was subsequently held without warrant or my consent in a 20-man, maximum security "pod" in the DALLAS COUNTY jail system until on or about October 9th, A.D. 2002.

106.   During my roughly ten days of false imprisonment within the DALLAS COUNTY jail system, I was threatened with being beaten by 1) one large DALLAS COUNTY employee in the presence of a purported "judge," 2) by a group of several black inmates, and 3) by two more DALLAS COUNTY employees who threatened to shove a "dirty sock" in my

mouth when they released me for extradition.

107.     During my roughly ten days of false imprisonment with the DALLAS COUNTY jail system, I met DALLAS COUNTY "extradition officer" Wood (or "Woods") three times, who deceived me into believing that I could be held within maximum security at the DALLAS COUNTY jail system for up to 180 days if I didn't agree to waive extradition, but that—if I did waive extradition—the STATE OF MISSOURI must send its officers to collect me within ten days, or I would be released; by means of this deception the DALLAS COUNTY "extradition officer" entered into the conspiracy to subject me to involuntary servitude and false imprisonment.

108.     I had last visited MISSOURI in A.D. 1995; I had not been in or within the STATE OF MISSOURI in connection with the alleged divorce case of A.D. 2001; I had not "fled" from MISSOURI before or after said alleged divorce proceeding or the fraud-based order to pay child support.

109.     While in the DALLAS COUNTY jail system, I could not afford and was not provided with access to legal counsel who could have informed me of the technicalities of extradition which I did not understand at that time.

110.     Fearing for my physical safety and fearing the loss of my home and business if I remained for 180 days in the DALLAS COUNTY jail system, falsely believing that I had actually been charged with a crime, and expecting that people in MISSOURI would be more reasonable concerning my arrest without warrant based on a fraudulent allegation of marriage—I agreed to waive extradition proceedings. [As it turned out, that "rights shit" worked even less well at JEFFERSON COUNTY, MISSOURI than it did at DALLAS COUNTY, TEXAS.]

111.     As condition for my waiver of extradition, I wrote "at arm's length" above my signature to signify that I agreed to be extradited only as a non-fiduciary and the DALLAS COUNTY "extradition officer" wrote "AKA-ALFRED ADASK TRUE NAME-Alfred Adask" below my signature to signify that "ALFRED ADASK" was a mere formality and did not signify some person, entity, account, estate or legal fiction but merely and exclusively signified the

living man (and now, Plaintiff), "Alfred Adask".

112.   On or about October 3rd, A.D. 2002, Lisa Bronchetti, MAGISTRATE IN AND FOR DALLAS COUNTY, TEXAS signed and sealed my conditional waiver of extradition.

113.   On or about October 9th, A.D. 2002, two employees of TRANSCORP OF AMERICA, acting on behalf of JEFFERSON COUNTY, MISSOURI, manifested their acceptance of my conditions on my waiver or extradition by removing me from the DALLAS COUNTY jail system and transporting me by means of motor vehicle to the JEFFERSON COUNTY, MISSOURI jail.

114.   On or about October 13th, A.D. 2002, the two employees of TRANSCORP OF AMERICA delivered me into the custody of the JEFFERSON COUNTY, MISSOURI jail whereat I was photographed, fingerprinted, and placed into a level-5, maximum security, ten-man "pod" containing 11 to 15 other prisoners.

115. I, Alfred Adask, am a beneficiary entitled to the "full and equal benefit of all laws and proceedings for the security of person and property" (see Chapter 31, 14 Stat. 27; April 9, A.D. 1866) including the Constitution for the United States of America, the Constitution for Texas (a State of the perpetual Union) and the Constitution of the State of Missouri (another State of said union); I appeared in regard to CV 300-3086 and CR302-3206 only and said beneficiary.

116: As per *The unanimous Declaration of the thirteen united States of America* of July 4th, A.D. 1776, and Article 4 Section 4 of the Constitution of The United States of America, and/or Article 1 Section 2 of the Texas Constitution and/or Article 1 Section 2 of the Missouri Constitution, the primary fiduciary duty of all sworn officers of the governments of the United States of America is to secure those God-given, unalienable rights to every beneficiary of said constitutions.

117.  I was unlawfully detained and falsely imprisoned 344 days for four general reasons:

1) Civil judgments and decree in the matter of CV 300-3086-DR are void for lack of subject matter jurisdiction and/or lack of personal jurisdiction over Alfred Adask; and/or fraud; and/or invoking courts equitable jurisdiction without clean hands; and/or

2) In combination, enforcing said civil cause by means of said criminal cause subjected me to involuntary servitude; and/or,

3) Violations of due course of law; and/or,

4) Official oppression.

118. "jurisdictional questions are never waved; they can be attacked at any time." *Waly v Johnston*, 316 U.S. 100 (1942); *Ther v U.S.* 544 F2d 759.

119. "A void judgment which includes judgment entered by court which lacks jurisdiction over the parties or the subject matter, or lacks inherent powers to enter the particular judgment, or in order procured by fraud, can be attacked at any time, in any court, either directly or collaterally…" *Long v Shorebank Development Corp.* 182 F3d 548 (1999).

120: "A void judgment is one which from its inception, is and forever continues to be absolutely null, without legal efficacy, ineffectual to bind the parties or to support a right, of no legal force and effect whatever, incapable of enforcement in any manner or to any degree." Lloyd v Director, Dept of Public Safety, 480 So.2d 577 (Ala. Civ. App. 1985).

121: "When rule providing for relief from void judgment is applicable, relief is not discretionary matter, but mandatory." *Orner v Shalaba*, 30 F.3d 1307 (Colo. 1994).

122: Both Public Defenders Vighi and Manansala—officers of the court—in agreement with purported "judges" Stoll and Wegge, <u>refused</u> to provide me with a collateral attack against void civil judgment on which the criminal obligation to pay child support was based.

123. <u>Criminal</u> cause number CR 302-3206 is based on an alleged breach of legal obligations first found in construed to <u>civil</u> cause number CV 300-3086-DR.

124. Criminal enforcement of the civil obligations constitutes involuntary servitude which is prohibited by the 13th article of amendment to The Constitution of The United States of America.

125. Under said 13th article of amendment, the criminal court in CR 302-3206 lacked subject matter jurisdiction to enforce a purported legal obligation first found and construed in civil cause number CV 300-3086-DR.

126. I deny the judgment and decree for CV 300-3086 satisfies the requirements at RSMo 452.343 which reads in part, " . . . every judgment order issued in this state which in whole or in part, affects child custody, child support... shall contain the Social Security number of the parties to the action which gives rise to such judgment or order." (See also RSMo 210.840.3)

127. I deny that any Social Security number is attributed to Alfred Adask in either civil case number CV 300-3086 or criminal cause number CR 302-3206.

128. RSMo 454.340 reads, "The support as confirmed shall have the same effect can be enforced as if originally entered in the court in the state. The procedures for enforcement thereof shall be as in civil cases." [emphasis added.]

129. I deny that the alleged Respondent "ALFRED NORMAN ADASK" in CV300-3086 was identified in the judgment decree for that civil clause by residents, employer, or Social Security number; I.e., said identification is insufficient.

130. RSMo 210.843 ("Enforcement of judgment or order . . . civil contempt") subparagraph three reads in part, "3. Willful failure to obey any judgment or order of the court entered pursuant to this section is a civil contempt of court..." [Emphasis added.]

131. RSMo 210.892.3 reads, "3. Notwithstanding subsection 2 of this section, personal jurisdiction may be asserted over any person if there is any basis consistent with the Constitution of this state or the United States."

132:  I deny that the Missouri Constitution offers any basis for asserting personal jurisdiction over a man living on Texas who has no "minimal contacts" with Missouri in civil cause number CV 300-3086.

133.  "Where rights secured by the Constitution are involved, there can be no rulemaking or legislation which would abrogate them." *Miranda v Arizona*, 384 U.S. 436.

134.  the 13th Article of Amendment the Constitution of The United States of America declares, "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." (Ratified on or about December 6th, A.D. 1865)

135.  "Constitutional provision is 'self-executing' if it supplies sufficient rule by which a right given may be enjoyed or duty imposed, enforced; constitutional provision is not 'self-executing' when it merely indicated principles without laying down rules giving them the force of law."  292 P 345, 348; *State v Perrault* 34 NM 348; 283 P. 902, 903.  Taken from *Black's Law Dictionary*, Revised 4th Edition, p. 1525.

136.  Said 13th amendment "… is <u>undoubtedly self executing</u> without any ancillary legislation,… By its own unaided force and effect it abolished slavery and established universal freedom." *Civil Rights Cases* 109 U.S. 3, 20 (A.D. 1883). [Emphasis added.]

137.  Said 13th amendment, "… is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." *Civil rights Cases* 109 U.S. 3 (A.D. 1883).

138.  Said 13th amendment, "… has a reflex character also, establishing and decreeing universal civil and political freedom throughout the United States." Civil Rights Cases 109 US 3 (A.D. 1883).

139.  Said 13th amendment, "… operated to abolish… conditions of <u>enforced</u> compulsory service of one to another…" *Hodges v U.S.* 203 U.S. 1 (A.D. 1906). [emphasis added]

140. Said 13th amendment, "… does not permit the withholding or deprivation of any right necessarily inhering in freedom… it prevents the imposition of any burdens or disabilities that constitute badges of slavery or servitude." *Plessy v Ferguson*, 163 U.S. 537, 556 (1896).

141. "No right granted or secured by the Constitution of the United States can be impaired or destroyed by a state enactment… the nullity of any act inconsistent with the Constitution is produced by the declaration that the Constitution is the supreme law. The state has undoubtedly the power, by appropriate legislation, to protect the public morals, the public health and public safety, but if, by their necessary operation its regulations looking to either of these ends amounts to a denial to persons within its jurisdiction of the equal protection of the laws, they must be deemed unconstitutional and void." *Gibbons v Ogden*, 9 Wheat 1, 210; *Sinnot v Dvenport*, 22 How. 227, 243; *Missouri, Kansa & Texas Ry v Haber*, 169 U.S. 613, 626; *Dobbins v Los Angeles*, 195 U.S. 223, 25 S.Ct. 18; *Connally v Union Sewer Pipe Co.*, 184 U.S. 540, 558.

142. "Involuntary servitude has been defined as a condition of <u>enforced</u> servitude by which the servitor is compelled to labor against his will in liquidation of some debt or obligation, either real or pretended, which imposed criminal liability and subjected to imprisonment those who breached their contracts quasi-contracts or <u>implied trust obligations</u>. Statutes which sought to coerce payment by means of <u>criminal</u> proceedings of a purely <u>civil</u> liability arising from breach of contract or obligation are unconstitutional and void." (See, *Peonage Cases*, 123 F. 671, (M.D. Ala. 1903) [Emphasis added.]

143. "… the term 'involuntary servitude' necessarily means a condition of servitude in which the victim is forced to work… by use or threat of physical restraint…, or by the use or threat of coercion through law or the legal process." *U.S. v Kozminski* 487 U.S. 931 (1988).

144. "Slavery implies involuntary servitude—a state of bondage; the ownership of mankind as chattel, or, at the least the control of labor and services of one man for the benefit of another, and the absence of a legal right to dispose of his own person, property, and services." *Plessy v Ferguson*, 163 U.S. 537 (1896). [Emphasis added.]

145. "That the holding of any person to service or labor under the system known as peonage is hereby abolished and forever prohibited… in any… Territory or State of the United States; and any and all acts, laws, resolutions, <u>orders</u>, regulations, or usages… of any… Territory or State of the United States,… by virtue of which any attempt shall hereafter be made to establish, maintain, or <u>enforce</u>, directly or <u>indirectly</u>, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation,… are hereby declared null and void…." Chapter 187, Session II, 39th Congress of the United States of America (March 2nd, A.D. 1867). [Emphasis added.] (See also, 8 U.S.C.A. 56; 42 U.S.C. 1994.)

146. The constitutionality of enforcing a <u>civil</u> court order with <u>criminal</u> procedures and penalty is "inextricably intertwined" with the 13th Amendment's prohibition against involuntary servitude. *Dist. of Columbia Court of Appeals v Feldman*, 460 U.S. 462, 482 (1983)

147. "The plain intention [of the 13th amendment] was to abolish slavery of whatever name and form and all its badges and incidents; to render impossible any state of bondage; to make labor free, by prohibiting that control by which the personal service of one man is disposed of or <u>coerced</u> for another's <u>benefit</u>, which is the <u>essence</u> of involuntary servitude." *Bailey v State of Alabama*, 219 U.S. 219, 241 (1911).

148. "Peonage is a term descriptive of a condition which has existed in South America… the essence of the thing is compulsory service in payment of a debt… and in this explicit and comprehensive enactment [of the act of March 2, A.D. 1867, see Fact 6.14, *supra*], Congress was not concerned with the mere names or manner of description, or with a particular place or section of the <u>country</u>. It was concerned with the <u>fact</u>, <u>wherever</u> it might exist; with a <u>condition</u>, however named and wherever it might be established, maintained, or enforced… It is the <u>compulsion of service</u> that the statute inhibits, for when that occurs the condition of <u>servitude</u> is created…" *Bailey v State of Alabama*, 219 U.S. 219, 242, (1911) [Emphasis added.]

149. The act of March 2, 1867 A.D. (see Facts 6.14 & 6.17, *supra*), "… nullifying all state laws by which it should be attempted to enforce the 'service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise' necessarily embraces all legislation which seeks to <u>compel</u> the service or labor by <u>making it a crime</u> to refuse or fail to perform it…

the state may impose involuntary servitude as a punishment for crime, but it may not compel one man to labor for another in payment of a debt, by punishing him as a criminal if he does not perform the service or pay the debt." *Bailey v State of Alabama*, 219 U.S. 219, 243-244 (1911). [Emphasis added.]

150.  Predicate acts under RICO at 18 U.S.C. 1961(1)(B) include "peonage, slavery, and trafficking in persons; 18 U.S.C. §§ 1581-1591.

151.  "What the State may not do directly it mean that do indirectly.  If it cannot punish the servant as a criminal for mere failure or refusal to serve without paying his debt, it is not permitted to accomplish the same result by creating a statutory presumption which, upon proof of no other fact, exposes him to conviction and punishment." *Bailey v. State of Alabama*, 219 U.S. 219, 244 (1911) [Emphasis added.]

152.  "That no person shall be imprisoned for debt, except for non-payment of fines and penalties imposed by law." Article 1 Section 11 *Missouri Constitution.*

153.  The alleged legal obligation to pay child support found and construed in Civil Cause number CV300-3086 was intended to be enforced through civil process. (See RSMo 451.010)

154.  RSMo 568.040.4 reads, "Criminal non-support is a class A misdemeanor, unless the person obligated to pay child support commits the crime of non-support in each of six individual months with any 12-month period, or the total arrearages is in excess of five thousand dollars, in either of which cases it is a class D felony."

155.  The purpose and/or effect of RSMo 568.040.4 is to convert a breach of civil obligation into a crime.

156.  The presumption created by RSMo 568.040.4 that nonsupport is criminal in nature is not a fact, but merely a rule of evidence.

157.  RSMo 568.040.4 embodies a substantial prohibition which squarely contravenes the 13th Amendment and the Act of Congress of March 2nd, A.D. 1867 (see Facts 6.18 and 6.19, supra), i.e., the effect of RSMo 568.040.4 is to authorize a jury or factfinder to convict and

imprison a man upon the opinion of a single judge in a <u>civil</u> cause that a mere <u>implied</u> trust relationship has been found in construed into a legal obligation imposed upon a defendant without his consent or actual knowledge.

158. I deny that the legislature of MISSOURI has authority to pass a constitutional statute to convert a civil obligation into a criminal offense.

159. The evidence set out in criminal complaint for CR 302-3206 is insufficient to establish the presumption that I manifested any criminal intent to refuse to provide support for any child.

160. RSMo 210.839.4 reads, "4. No party shall have a right to a trial by jury. Almost a presumption applies pursuant to section 210.822, the burden of proof on all issues shall be by a <u>preponderance</u> of the evidence." [Emphasis added.]

161. The central element of the criminal complaint against me in CR302-3206 is the existence of a "legal obligation" to pay child support.

162. The alleged "legal obligation" underlying the <u>criminal</u> complaint CR302-3206 against me was based on the mere <u>presumption</u> based on the *prima facie* evidence of a single witness in <u>civil</u> case CV300-3086 that I am the natural father of the child in question; said "criminal" presumption was found pursuant to RSMo 210.822 by a single judge in <u>Civil</u> Cause number CV300-3086 based upon a mere <u>preponderance</u> of the evidence provided by a single witness.

164. The central element of the crime alleged in criminal complaint CR 302-3206 and/or the criminal cause number CR 302–3206 has not been determined by a jury nor <u>beyond a reasonable doubt</u>.

165. The denial of determination of an element of a criminal charge beyond a reasonable doubt by a jury constitutes a denial of the fundamental right of the accused to the presumption of innocence and violates due course of law.

166. I deny that there is any evidence that the presumption that I am the natural father of the child Alexandra Nicole Adask was found beyond a reasonable doubt.

167. I deny that I have been "duly convicted" (as per the 13th Amendment) of any crime whereof I might be lawfully punished by means of involuntary servitude.

168. I deny that I have voluntarily and knowingly consented to serve as fiduciary for any man, legal person, legal personality, legal entity, trust, account, corporation or unincorporated association that is expressly named or implied as a party or beneficiary in civil cause number CV 300-3086 or for any constructive trust or declaratory judgment construed as entered thereby.

169. I was unlawfully detained and subjected to 344 days of false imprisonment by one or more officers and/or judges and/or employees and/or jail and/or Circuit Court of JEFFERSON COUNTY MISSOURI in violation of the 13th amendment for term extending from October 13, A.D. 2002 until my release on September 8th, A.D. 2002.

170. My condition as victim of involuntary servitude was noticed to the courts by my petitions for writ of habeas corpus docketed on "2003-03-14," and "2003-04-15" in the docket sheet for CR 302-3206.

171. I was held in the condition of involuntary servitude by virtue of one or more agreements between the Jefferson County prosecutor's office, the Office of Public Defender, and/or the judges of the Circuit Court of Jefferson County and/or one or more individuals associated with those offices and/or court.

172. I was held under force of arms from September 30th, A.D. 2002 until September 8th, A.D. 2003, in a condition of involuntary servitude for the purpose of satisfying a real or imagined debt and/or obligation.

173. Title 18 U.S.C. Section 1584 makes it a federal crime or offense for anyone to willfully hold another person involuntary servitude and reads, in part, "Whoever knowingly and willfully holds to involuntary servitude…, any other person for any term… shall be fined under this title or imprisoned not more than 10 years, or both."

174. Title 18 U.S.C. Section 1581 reads, in part, "Whoever holds or returns to person to a condition of peonage, or arrests a person with the intent of placing him or returning him to a condition of peonage, shall be fined under this title or imprisoned not more than 20 years, or

both… whoever obstructs or attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be liable to the penalties prescribed in subsection (a)." (See also Chapter 464, Sess. I, 43rd Congress of the United States of America, June 23rd, A.D. 1874.)

175.   My clearly-established right to be free from involuntary servitude is also secured by Article 1 of The Constitution of The State of Texas and/or "An Act to Admit the State of Texas to representation in Congress of the United States" as approved by the Senate and House of Representatives of the United States of America on or about March 30th, A.D. 1870.

176.   Said condition of involuntary servitude imposed upon me by said <u>civil</u> judgment and decree CV300-3086 and subsequent <u>enforcement</u> by <u>criminal</u> cause number CR 302-3206 is unconstitutional and void.  (See *U.S. v Kozminski*, 487 U.S. 931 (1980); RSMo 506.180(5).)

177.   "Since an unconstitutional law is void, the general principles follow that imposes no duties, and confers no rights, creates no office, bestows no power or authority on anyone, affords no protection, and justifies no acts performed under it… the void act cannot be legally consistent with a valid one.  An unconstitutional law cannot operate to supersede any existing a valid law. Indeed insofar as a statute runs contrary to the fundamental law of the land, it is superseded thereby… no one is bound to obey an unconstitutional law and no courts are bound to enforce it." *16th American Jurisprudence*, 2nd Edition, Section 177.

178.   "Aggravated felony" is defined at 8 U.S.C. § 1101(a)(43) to include an offense described in title 18 relating to slavery, <u>peonage</u>, <u>involuntary servitude</u> and any attempt or conspiracy to commit one of said offenses.

179.   "The essential elements of due course of law are notice, an opportunity to be heard and the right to defend in an orderly process. (See, *Fieho v R.E. Householder Co.*, 125 So. 2, 7 (Fla. 1929).)

180.   The purpose for due course of law is, "… to exclude oppression and arbitrary power from every branch of government." (*Dupry v Tedura*, 15 So. 2d 886, 890, 204 La. 560 (1943).)

181.   I deny that I, Alfred Adask, was served proper notice of the hearing for civil cause number CV 300-3086 as required by the Uniform Parentage Act, and/or Missouri Family Code

and/or by the Interstate Family Support Act and/or the rules of the Missouri Supreme Court by personal service, by registered mail to the United States Post Office, or by publication.

182.   I deny that I, Alfred Adask, was in default it said hearings for CV 300-3086.

183.   The judgments and decree dated March 7th, A.D. 2001 for CV 300-3086 are void for lack of service of process and/or proper notice to Alfred Adask.

184.   Article 1 Section 15 of the Texas Constitution declares in part, "The right of trial by jury shall remain inviolate."

185.   Article 1, Sections 18(a) and 22(a) of the Missouri Constitution secure and guarantee the right to a trial by jury.

186.   The Sixth Article of Amendment to the Constitution of the United States of America secures and guarantees the right to trial by jury.

187.   RSMo 210.839.4 reads in part, "No party shall have a right to a trial by jury."

188.   The central element of the <u>criminal</u> charges in CR 302-3206 is that a legal obligation exists for Alfred Adask to pay or provide child support; that element is a mere presumption found only on a <u>preponderance</u> of evidence in a <u>civil</u> trial CV 300-3086 without the right to a trial by jury.

189.   I deny that I am legally obligated to pay child support by the order issued in CV300-3086.

190.   As a man and a citizen of The State of Texas—a member-State of perpetual Union– I deny that I am subject to any criminal proceedings wherein one or more elements of the alleged crime are not determined beyond a reasonable doubt and/or are not subject to determination by a jury of my peers.

191.  In A.D. 1991, in the case of *Riverside County v McLaughlin*, No. 89-1817, the Supreme Court of the United States declared that anyone arrested without a warrant was entitled to a probable cause hearing within 48 hours of said arrest.

192.  I was arrested without warrant on September 30th, A.D. 2002.

193.  My first probable cause hearing was scheduled September 8th, A.D. 2003

194.  Rather than provide me with a probable cause hearing, purported "judge" Wegge chose to simply release me—after 344 days of false imprisonment, without having been charged with a crime, given a probable cause hearing, arraigned, tried or convicted.

195. On or about November 14th, A.D. 2002—46 days after I was originally arrested without warrant and 33 days after I was first detained in the Jefferson County Jail—I was called from my cell within Jefferson County Jail on Missouri to attend a closed-circuit TV "arraignment" conducted by Mark T. Stoll, associate judge, Circuit Court of Jefferson County; I had no previous notice of said "arraignment."

196.  Said closed-circuit TV "arraignment" failed to satisfy the requirements of Missouri Supreme Court rule 24.01 that arraignment be conducted "in open court" and that the alleged defendant "be given a copy of the indictment or information <u>before</u> he is called upon to plead." [Emphasis added.]

197.  I did not appear in open court at said "arraignment"; i.e., the judge acted from one location outside of and several miles distant from the Jefferson County Jail while I remained within said jail.

198.  It was physically <u>impossible</u> for the judge at said "arraignment" to give me a copy of the information for my alleged charge; i.e., we were into different buildings separated by several miles.

199.  I deny receiving a copy of the information for CR 302-3206 at alleged "arraignment" and/or "before" I was asked to plead to the alleged charges.

200.  I deny being informed of any bond amount at said alleged "arraignment".

201.   At said closed-circuit TV "arraignment" I expressly denied: that I am the person charged, that I am fiduciary for the person charged, that the court had subject matter or personal jurisdiction, and that I understood the charges against me.

202.   Docket entry dated "2002-11-14" for docket sheet for CR 302-3206 omits all reference to my denials (see fact 8.06, *supra*).

203.   Said docket entry dated "2002-11-14" is a "boilerplate" entry which falsely and fraudulently reads, "a not guilty plea entered by defendant (or on behalf of defendant) ** ARRAIGNMENT—FEL COMPL. OR MISD. INFORMATION ** Defendant appears in person.  Charges were read to defendant; court finds he/she understands same, right to hired or a plaintiff attorney, and the right to remain silent.  Bond is set at $2500.00 ** ADJOURN DOCKET ** ..../s/ MARK STOLL Division No. Twelve, 23rd Judicial Circuit."

204.   Alleged judge Mark T. Stoll <u>lied</u> in said docket entry.

205.   I was held within the Jefferson County Jail on Missouri from October 13th, A.D. 2002 until I was released on September 8th, A.D. 2003 without ever being lawfully arraigned.

206.   Docket entry dated "2003-02-05" for Docket sheet for CR 302-3206 reads, "ORDER FOR APPOINTMENT OF PUBLIC DEFENDER. IT IS SO ORDERED this date.../s/ MARK STOLL . . . ."

207.   I deny that I applied for the assistance of a Public Defender.

208.   On or about February 7th, A.D. 2003, I was called from my cell within the Jefferson County Jail on Missouri to meet with Mr. Stephen Vighi—a public defender from the Missouri office of public defender; I had no previous notice of said meeting or Mr. Vighi's alleged appointment as my public defender.

209.   At said meeting on February 7th, A.D. 2003, I told public defender Vighi that I wanted to defend against the criminal allegations against me in CR302-3206 by mounting a collateral attack on <u>civil</u> case CV300-3086 (on which the criminal charge against me was based) as being void.

210. At said meeting on February 7th, A.D. 2003, public defender Vighi told me that Public Defender rules prevented him from "touching" a civil case and that therefore he could not attack the civil case CV 300–3086 underlying the criminal cause number CR 302–3206 with which I was allegedly charged.

211. Because Vighi could not provide me with an effective defense, I asked Vighi to withdraw as my alleged counsel; Mr. Vighi declared that because Judge Stoll had appointed him, he could not agree to withdraw as my alleged council.

212. On or about March 4th, A.D. 2003, I filed a grievance against Mr. Vighi with the Office of Chief Disciplinary Counsel for the Supreme Court of Missouri.

213. In said grievance, I claimed by affidavit that Mr. Vighi, "judge" Stoll, and the Office of Public Defender were engaged in a conspiracy to deprive me of an effective defense.

214. On March 7, A.D. 2003, I received a notice from Mr. Vighi dated March 5, 2003 that he had filed a motion to withdraw as counsel from CR 302-3206-F4-A12; said motion was set for hearing on March 12, 2003.

215. Docket entry dated "2003-02-10" for CR 302-3206, reads, "MOTION TO REDUCE BOND TOGETHER WITH NOTICE OF HEARING SET FOR 3-12-03 FILED."

216. On March 12, A.D. 2003, I was called from my cell to attend the hearing at court before "judge" Stoll to hear Mr. Vighi's motion to withdraw as Public Defender from CR 302-3206.

217. I deny that said hearing of March 12, A.D. 2003 at any time raised or considered the issue of reducing my bond from $2,500.00.

218. At said hearing of March 12th, A.D. 2003, I explained that I needed assistance of counsel but could not use Mr. Vighi since he could not mount a collateral attack on the civil case which created the alleged "legal obligation" which was the central element of the criminal allegations against me.

219. At said hearing of March 12th A.D. 2003, employee Vighi agreed that he could not attack the civil case due to Office of Public Defender rules; "judge" Stoll nodded in agreement.

220. Judge Stoll closed said hearing of March 12, A.D. 2003, saying he'd take the motion for a withdrawal of Council "under advisement" and sent me back to my cell within said Jefferson County Jail.

221. Despite my request for assistance of counsel able to provide an effective defense, no other competent attorney who was not bound by rules of the Public Defender's Office was appointed in his place.

222. On or about April 1st, A.D. 2003, I received a copy of the docket sheet for CR 302-3206 printed on "2003-03-24" which read in part "2003-03-12 PUBLIC DEFENDER'S MOTION TO WITHDRAW AS COUNSEL HEARD AND GRANTED . . . ."

223. Employee Stoll's statement at the hearing of March 12, A.D. 2003, that he'd take the motion to withdraw "under advisement" and docket entry that said motion was that day "GRANTED," is evidence of employee Stoll's intent to deceive me, to deprive me of the assistance of counsel, and continued to subject me to involuntary servitude.

224. Between January 27, A.D. 2003, and April 15, A.D. 2003, four petitions for writ of habeas corpus were filed on my behalf: one was entered on to the docket sheet for CR 302-306 as a "LETTER"; another was listed as a "CORRESPONDENCE"; a third as "PETITION FOR GREAT WRIT OF HABEAS CORPUS"; and the fourth was not docketed but was instead returned to me asking for a $105.00 filing fee or a completed application to proceed *in forma pauperis*.

225. Copies of said first two writs of habeas corpus written and filed by others on my behalf were ordered sent to the prosecuting attorney by Judge Stoll (see docket entries dated "2003-01-27" and "2003-03-14" for CR302-3206) but no copies were sent to me.

226. I deny that employee Stoll heard or agreed to hear any one of the two petitions for writ of habeas corpus filed by me or the two other petitions filed by others on my behalf.

227. At said hearing of March 12, A.D. 2003, when I asked the employee Stoll to please consider my petition for writ of habeas corpus, he replied, "I don't want to do a habeas corpus, now."

228. Employee Stoll's repeated refusals to hear my petitions for writ of habeas corpus demonstrates a denial of my right to a presumption of innocence, my right to petition for writ of habeas corpus, a shocking of difference to my condition of involuntary servitude and false imprisonment, and a willingness to conspire to keep me in that condition.

229. *Bounds v Smith*, 430 U.S. 817, reads in part, "The fundamental constitutional right of access to the courts held to require prison authorities to assist inmates… by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. *Younger v Gilmore*, 404 U.S. 15 pp 821-833."

230. I deny that Jefferson County Jail—the primary place of my false imprisonment— had a law library for prisoners during my period of false imprisonment.

231. I deny the Jefferson County Jail provided adequate assistance of persons trained in the law to prisoners accused of <u>criminal</u> violations based on breach of <u>civil</u> obligations found and construed in a <u>civil</u> cause.

232. I was scheduled to appear at a preliminary hearing on May 2nd, A.D. 2003, (See docket entry dated "2003-03-17" for CR302-3206) without assistance of counsel.

233. I declared my need for assistance of counsel in my petition for writ of habeas corpus filed as a "CORRESPONDENCE" as her docket entry dated "2003-03-14" for CR 302-3206.

234. Throughout all of the 344 days of my false imprisonment I needed—and through most of my time in the Jefferson County Jail, I requested—the assistance of counsel able to effectively defend me against criminal charges alleged in the CR 302-3206 by means of a collateral attack on <u>civil</u> cause number CD 300-3086 as void and/or by means of a direct attack on said <u>criminal</u> charges as based on <u>civil</u> obligation as an unconstitutional attempt to subject me to involuntary servitude; no such assistance was ever provided.

235. On or about April 10, A.D. 2003, I sent a letter through the U.S. Postal Service to assistant prosecutor Cynthia Carle of the Jefferson County Prosecutor's Office who was purportedly prosecuting CR 302-3206.

236. In said letter of April 10th, A.D. 2003, I reminded the Ms. Carle of her "special responsibility" under Missouri Supreme Court rule 3.8 to advise defendants without counsel on the correct procedure for obtaining counsel.

237. I filed a copy of said letter of April 10th, A.D. 2003, with the Circuit Court clerk (see Docket entry dated "2003-04-15" for CR 302-3206).

238. Assistant Prosecutor Carle made no reply to my letter of April 10, A.D. 2003.

239. Docket entry dated "2003-02-10" for CR 302-3206 reads in part "defendant has been determined to be indigent".

240. "The right of an indigent defendant in a criminal trial to the assistance of counsel... is guaranteed by the sixth amendment has made applicable to the states by the 14th, 372 U.S. 355, . . . . No accused may be deprived of his liberty as a result of any criminal prosecution, whether felony or misdemeanor, in which he was denied the assistance of counsel." *Argensinger v. Hamlin*, 407 U.S. 25 (A.D. 1972).

241. I was falsely imprisoned within the Jefferson County Jail for roughly 330 days, based on lies, deceit, fraud, reckless indifference to my clearly-established rights, moral turpitude, and one or more of agreements and conspiracies between members of the Office of Public Defender, Jefferson County Prosecutor's Office, and/or employee Stoll and/or employee Wegge to deprive me of my liberty and/or subject me to involuntary servitude.

242. The tort of "malicious abuse of the legal process" requires a perversion of court process to accomplish some and which the process was not designed to accomplish. *Capital electric Co. v. Cristaldi*, D.C. Md 157 F.Sup. 646, 648.

243. 18 U.S.C. 1961(1)(B) recognizes RICO "predicates acts" of (j) mail fraud: 18 U.S.C. § 1341; (k) wire fraud: 18 U.S.C. § 1343; (q) obstruction of justice: 18 U.S.C. § 1503; (t) tampering with a witness, victim or informant: 18 U.S.C. § 1512; and (u) retaliating against a

witness, victim or informant: 18 U.S.C. § 1513; (z) peonage, slavery and trafficking in persons: 18 U.S.C. § 1581-1591.

245.  Texas law provides a two-year statute of limitations on court actions based on common law marriages.

246A.  Debra Ann Bertke/Adask falsely claimed under in the March 7th, A.D. 2001 that she had lived with me for 2 years as man and wife starting with our alleged marriage on or about December 1st, A.D. 1995 and extending until on or about January 1st, A.D. 1998.  Under Texas law, her statute of limitations for enforcing an <u>actual</u> common law marriage would've expired on or about January 1st, A.D. 2000.  I.e., even if there had been an actual common law marriage, and even if such common law marriage had been recognized by some "public Act, Record of judicial proceeding" of Texas, employee Patterson could not have lawfully extended "full faith and credit" to such common law marriage on March 7th, A.D. 2001.

246B.  Again, I deny that employee Patterson had subject matter jurisdiction over an alleged common law marriage which: 1) did not ever take place; 2) was not reported in any public Act, Record of judicial proceeding of Texas; or 3) on March 7th, A.D. 2001—three years after Debra Ann Bertke/Adask claims to have left me.

247.  Civil case CV 300-3086 was and is void; there was never any lawful ground to presume that I had a "legal obligation" to pay child support; without a "legal obligation" to pay child support, the criminal allegations associated with CR302-3206 cannot be proved.

248.  I deny that the employees of JEFFERSON COUNTY, MISSOURI every had subject matter jurisdiction in the matter of CV300-3086 nor in personam jurisdiction in the matter of CR302-3206.

249.  "Void judgments are those rendered by a court which lacked jurisdiction, either of the subject matter or the parties." *Milliken v Meyer*, 311 U.S. 457, 61 S.Ct. 339 (A.D. 1940)

250.  "A void judgment is one which, from its inception, was a complete nullity and without legal effect." *Lubben v Selective Service System Local Bd. No. 27*, 453 F.2d 645 (A.D. 1972).

251. A void judgment is a simulated judgment devoid of any potency because of jurisdictional defects only, in the court rendering it and defects in jurisdiction may relate to a party or parties, the subject matter, the cause of action, the question to be determined, or relief granted. *Davidson Chevrolet, Inc. v. Cit and County of Denver*, 330 P.2d 1116, 79 S.Ct. 609, 359 U.S. 926 (A.D. 1958).

252. A void judgment is subject to direct or collateral attack <u>at any time</u>. *Hampton v Hampton*, 536 SW2d 324, 326 (Mo. App. A.D. 1976)

253. "Void judgment is one which has no legal force or effect whatever; it is an absolute nullity, <u>it's invalidity may be asserted by any person whose rights are affected at any time and at any place</u> and it need not be attacked directly but <u>may be attacked collaterally whenever and wherever it is interposed</u>." *City of Lufkin v McVicker*, 510 SW2d 141 (Tex. Civ. App—Beaumont A.D. 1973). [Emphasis added.]

254. "A void judgment is one which has no legal force or effect, <u>invalidity of which may be asserted by any person whose rights are affected at any time and at any place directly or collaterally</u>. One which, from its inception is and forever continues to be absolutely null, without legal efficacy, ineffectual to bind parties or support a right, of no legal force and effect whatever, and <u>incapable</u> of confirmation, ratification, or <u>enforcement in any manner or to any degree</u>." *K&K Invs. Inc. v McCoy*, 875 S.W.2d 593, 596 (Mo. App. E.D. A.D. 1994). [Emphasis added.]

255. An order or judgment based on a void order or judgment is also void. *Austin v Smith*, 312 F.2d 337, 343 (A.D. 1962); *English v English*, 72 Ill App3d 736, 393 NE 2d 18 (1st Dist. A.D. 1979).

256. RSMo 506.180(5) declares, "No person shall be arrested, held to bail, or imprisoned, on any mesne process or execution founded upon any civil action whatsoever."

257. Complaint in criminal cause number CR302-3206 was used to enforce an alleged legal obligation founded upon a civil action CV300-3086.

258. At all times and in all manner of conduct relevant to the allegations, facts, findings, judgments, decrees and orders relevant to CV300-3086 and/or CR302-3206, I acted exclusively

on the soil within the boundaries of one of more of the several States of the perpetual Union styled "The United States of America"—places protected by the 13th Amendment to The Constitution of The United States of America.

260. Said 13th Article of Amendment "is undoubtedly self-executing without any ancillary legislation . . . . By its' own unaided force and effect, it abolished slavery and established universal freedom." Civil Rights Cases, 109 U.S. 3, 20 (A.D. 1883).

261. Said 13th Article of Amendment ". . . is not a mere prohibition of State laws establishing or upholding slvery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." *Civil Rights Cases*, 109 U.S. 3 (A.D. 1883). [Emphasis added.]

262. The *Peonage Cases*, 123 F 671 (M.D. Ala, A.D. 1903) declared that the use of a statute to coerce payment by means of criminal proceedings of a purely civil liability to be unconstitutional.

263. A State "may not compel one many to labor for another in payment of a debt by punishing him as a criminal if he does not perform the service or pay the debt." *Bailey v. Alabama*, 291 U.S. 219, 244 (A.D. 1911).

264. I knew from the moment I was arrested without warrant on September 30th, A.D. 2002, that there was no marriage between myself and Debra Ann Bertke; that Debra, herself, had refused to consent to be married to me; that she had manifested that refusal by not taking my family name and by leaving my domicile on or about June, A.D. 1996; that the allegations against me were based on fraud; that Debra Ann Bertke also KNEW that the allegations against me were based on fraud.

265. Debra Ann Bertke and her attorney Descher KNEW that the case against me was based on fraud.

266. The two public defender employees Vighi and Manansal KNEW that I had a valid defense but refused to provide that defense.

267. Patterson, Stoll and Wegge, employed as "judges" for JEFFERSON COUNTY, MISSOURI knew or had reason to know that the allegations against me were false, but nevertheless left me to "rot" in their employer's jail without once allowing me to present evidence in my defense.

268. I spent 344 days in maximum security trying to get someone, anyone, to simply let me present my evidence and argument; I wanted one lousy hour to make my "pitch"; I filed grievances with the jail and grievance with the Bar; I filed two petitions for writ of habeas corpus and two more were filed by others on my behalf; yet not one employee of the "system" would give me the simple courtesy of allowing me to be heard.

269. I recused Stoll who was employed as a "judge"; his replacement Wegge was every bit as intractable and unwilling to hear my defense.

270. Knowing all Public Defenders to provide only ineffective assistance of counsel in my case, I forced Vighi to quit my case and I refused to acknowledge another public defender employee Manansala as Vighi's replacement while Wegge insisted that Manansala was and would remain my "counsel" despite my objections.

271. I specifically asked the court to appoint counsel who was not associated with the public defender's office and thus able to make a collateral attack on CV300-3086; my requests were ignored.

272. Every one of these defendants and/or employees KNEW that there was no ground for the allegations against me, no ground to charge me, no ground to arrest me, no ground to hold me indefinitely; they KNEW I was innocent of the allegations against me and that I could prevail in an open court; every one of these employees continued to conspire to hold me indefinitely in their jail, deprive me of my liberty, subject me to torture, and attempt to coerce me into unwittingly witnessing against myself in a way that would allow them to proceed against me.

273. Not one of the defendant employees; not one cop, not one judge, not one public defender, not one prosecutor, not one guard, not one employee gave a damn; not one of these employees would give me one lousy hour to present my defense.

274. Instead, the defendants and/or employees refused to hear me because they knew what I was going to say, and they didn't want to hear it or see it presented on the record.

275. On September 8th, A.D. 2003—344 days after my original warrantless arrest—when I was finally scheduled for a probable cause hearing, employee Wegge ordered me released without even allowing me to enter into the court room.

276. For 344 days, every one of the defendants knew or should have known they had no warrant, no charge, no valid case against me, and yet they kidnapped me, deprived me of my Liberty, subjected me to torture for the purpose of compelling me to testify against myself and/or on behalf of my accuser so as to subject me to involuntary servitude; for 344 days, they acted against me with <u>malice</u>.

277. As a result of those 344 days of kidnapping, false imprisonment, loss of Liberty, torture for the purpose of coercing me to submit to an involuntary servitude or paying child support where there was no legal obligation to do so, I lost my business of 12 years which published and distributed news magazines throughout the several United States and several foreign countries, my radio show which broadcast to virtually all of the several United States, my domicile of 8 years, two cars, 18 years of files, an unknown number of books and software programs, most of my personal property, my personal liberty and reputation and was rendered virtually homeless and destitute.

278. On or about January, A.D. 2004—approximately 4 months after I had been released from the JEFFERSON COUNTY JAIL, some or all of the same parties who had previously conspired to cause me to be falsely imprisoned for 344 days, tried again—and again without warrant—to kidnap me from my current domicile within The State of Texas for the purpose of coercing me to accept the same involuntary servitude. They were unsuccessful because I would not exit from within my domicile.

279. On or about April, A.D. 2004, some or all of the same parties who had previously conspired to cause me to be falsely imprisoned for 344 days, tried again—and again without warrant—to kidnap me for the purpose of coercing me to accept the same involuntary servitude

from my current domicile within The State of Texas. They were unsuccessful because I would not exit from within my domicile.

280. So far as I know, as of the date of this Complaint, I am still under threat of another warrantless arrest that may result in another indefinite period of false imprisonment to enforce an involuntary servitude.

## COUNT I

## VIOLATIONS OF RICO 18 U.S.C. § 1961(1)(b)

### (All Defendants)

281. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 280 as if fully set forth herein and seeks to recover damages based upon a claim of violations of the RICO Act.

282. All defendants associated with Debra Ann Bertke/Adask, CV300-3086 and/or CR302-3206 and purportedly working on Debra's behalf or purportedly on behalf of the child Alexandra Nicole Adask were, at all relevant times, an association-in fact and an "enterprise" engaged in, and whose activities affect, interstate commerce.

283. Since the onset of this matter in A.D. 1995, some defendants (like Patterson, Wilson and Menefee) were only associated with Debra Ann Bertke/Adask, CV300-3086 and/or CR302-3206 for a few hours; the others were associated for months or even years—but all were associated in a "pattern" of racketeering acts for the common purpose of subjecting Alfred Adask to involuntary servitude of paying child support without a legal obligation to do so; all defendants did agree to use their powers, abilities and/or offices in a manner that was unjust and unlawful and outside the scope of their employment to compel or assist in the compulsion of said involuntary servitude by means of communicating fraudulent information by mail and/or wire, warrantless arrest, kidnapping, false imprisonment and torture for the purpose of extracting

information from a witness by means of physical or mental torment.

284. 18 U.S.C. 1961(1)(B) recognizes RICO "predicates acts" of (j) mail fraud: 18 U.S.C. § 1341; (k) wire fraud: 18 U.S.C. § 1343; (q) obstruction of justice: 18 U.S.C. § 1503; (t) tampering with a witness, victim or informant: 18 U.S.C. § 1512; and (u) retaliating against a witness, victim or informant: 18 U.S.C. § 1513; (z) peonage, slavery and trafficking in persons: 18 U.S.C. § 1581-1591.

285. Each of the defendants performed, participated in or agreed to condoned one or more of the pattern of these predicate acts in a pattern in a scheme to subject Alfred Adask to involuntary servitude by means of fraud, false arrest, false imprisonment, kidnapping, deprivation of Liberty, denial of due course of law—all in violation of the scope of their lawful employment.

286. Defendants and each of them have directly and indirectly conducted and agreed to participate in the conduct of the enterprise's affairs through a pattern of racketeering described above in violation of 18 U.S.C. 1961(1)(B).

287. Defendants and each of them have directly and indirectly conducted and participated in the conduce of the enterprise's affairs through a pattern of racketeering described above in violation of 18 U.S.C. 1961(1)(B).

287. The racketeering acts were continuous from A.D. 2000 through, at least, A.D. 2004, may continue to this day, and constitute a pattern of racketeering pursuant to 18 U.S.C. 1961.

288. As the direct and proximate cause, defendants' intentional and malicious racketeering activities in violation of 18 U.S.C. 1961(1)(B), Alfred Adask has been injured in his business and property in that, without limitation, among other things:

a) I lost 344 days of my liberty, whose value I declare to be $25,000.00 per day;

b) I lost substantial monies in connection with loss of my former business and reputation;

c) I lost substantial wealth and value due to the loss of my personal and intellectual property.


# COUNT II

## 18 U.S.C. CHAPTER 77, PEONAGE, SLAVERY, AND TRAFFICKING IN PERSONS

289.  Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 288 as if fully set forth herein and seeks to recover damages based upon a claim of violations of 18 U.S.C. Chapter 77, Peonage, Slavery and Trafficking in persons.

290.  18 U.S.C. § 1581. Peonage; obstructing enforcement, declares:

> (a) Whoever holds or returns any person to a condition of peonage, or arrests any person with the <u>intent of placing him in</u> or returning him to <u>a condition of peonage</u>, shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes <u>kidnapping</u> or an attempt to kidnap, aggravated sexual abuse or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.

> (b) Whoever obstructs, or attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be liable to the penalties prescribed in subsection (a).  [Emphasis added.]

291. All defendants have participated in a scheme or conspiracy to falsely arrest, kidnap and indefinitely deprive Plaintiff, Alfred Adask, of his Liberty for the purpose of placing him in a condition of peonage.

292.  18 U.S.C. § 1589. Forced labor declares: "Whoever knowingly provides or obtains the labor or services of a person –

> "(1) by threats of serious harm to, or physical restraint against, that person or another person;
> "(2) by means of <u>any scheme, plan, or pattern</u> intended to cause the person to <u>believe</u> that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or

"(3) by means of the abuse or threatened abuse of law or the legal process, shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes <u>kidnapping</u> or an <u>attempt to kidnap</u>, aggravated sexual abuse or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both."

293.   All defendants have committed fraud and/or used their apparent positions of authority to deceive Alfred Adask and to create the false <u>belief</u> that the alleged "legal obligation to pay child support" in CV300-3086 and CR302-3206, my arrest without warrant, false imprisonment for 344 days, attempts to subject me to involuntary servitude and/or peonage, and torture were lawful and just and that I must therefore "voluntarily" consent such servitude.

294.   18 U.S.C. § 1590 ("Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor") declares,

"Whoever knowingly recruits, harbors, <u>transports</u>, provides, or <u>obtains by any means</u>, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes <u>kidnapping</u> or an attempt to kidnap, aggravated sexual abuse, or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both."

295.   Defendants caused Alfred Adask to be arrested without warrant, under force of arms and against his will, deceived, and <u>transported</u> from his domicile to the CARROLLTON TEXAS JAIL, and then the DALLAS TEXAS COUNTY JAIL, then across at least two State boundaries to JEFFERSON COUNTY, MISSOURI JAIL for the purpose of subjecting Alfred Adask to involuntary servitude and/or peonage.

296.   18 U.S.C. § 1593 ("Mandatory restitution") declares, in part,

"(a) Notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalties authorized by law, the court shall order restitution for any offense under this chapter.
"(b)(1) The order of restitution under this section shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses, as determined by the court under paragraph (3) of this subsection.
  "(2) An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A.

"(3) As used in this subsection, the term "full amount of the victim's losses" has the same meaning as provided in section 2259(b)(3) and shall in addition include the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum Wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. 201 et seq.). [Emphasis added.]

"(c) As used in this section, the term "victim" means the individual harmed as a result of a crime under this chapter, . . . ."

297. 18 U.S.C. § 1594, "General provisions" declares

"(a) Whoever attempts to violate section 1581, 1583, 1584, 1589, 1590, or 1591 shall be punishable in the same manner as a completed violation of that section.

"(b) The court, in imposing sentence on any person convicted of a violation of this chapter, shall order, in addition to any other sentence imposed and irrespective of any provision of State law, that such person shall forfeit to the United States -

"(1) such person's interest in any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of such violation; and

"(2) any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation.

"(c)(1) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

"(A) Any property, real or personal, used or intended to be used to commit or to facilitate the commission of any violation of this chapter.

"(B) Any property, real or personal, which constitutes or is derived from proceeds traceable to any violation of this chapter.

"(2) The provisions of chapter 46 of this title relating to civil forfeitures shall extend to any seizure or civil forfeiture under this subsection.

"(d) Witness Protection. - Any violation of this chapter shall be considered an organized criminal activity or other serious offense for the purposes of application of chapter 224 (relating to witness protection).

298. 18 U.S.C. § 1595, "Civil remedy" declares,

"(a) An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

"(b)(1) Any civil action filed under this section shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.

"(2) In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.

299. As the direct and proximate cause, defendants' intentional and malicious actions in violation of 18 U.S.C. Chapter 77, Alfred Adask has been injured in his business and property in that, without limitation, among other things:

a) I lost 344 days of my liberty, whose value I declare to be $25,000.00 per day;

b) I lost substantial monies in connection with loss of my former business and reputation;

c) I lost substantial wealth and value due to the loss of my personal and intellectual property.

## COUNT III

## FALSE IMPRISONMENT

299A.  Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 299 as if fully set forth herein and seeks to recover damages based upon a claim of false imprisonment.

300.  42 U.S.C. § 1983. Civil action for deprivation of rights.  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

301.  *Flynn v State*, 667 S.W.2d 234, 239 (Tex.App.—El Paso, A.D. 1984) aff'd, 707 S.W.2d 87 (Tex.Crim.App. A.D. 1985) declares, in part, that CCP "Article 16.17 states that a failure to make or enter an order of commitment within forty-eight hours operates as a finding of no probable cause . . . . [T]he provision is intended to prevent a magistrate from deferring his ruling until indictment renders the issue moot."

302. Plaintiff alleges that he had no "legal obligation" to pay child support under CV300-3086 and/or CR302-3206 and there was no lawful basis for his arrest or imprisonment for 344

days.

303. Plaintiff alleges that he has sovereign immunity from the enforcement of the alleged claim against him.

304. Defendants falsely imprisoned Plaintiff against his will and without probable cause and failed, refused and neglected to take reasonable and necessary action to ascertain the falsity of Plaintiff's imprisonment.

305. Defendants could have, during the duration of Plaintiff's false imprisonment, ascertained that Plaintiff was being falsely imprisoned had employees exercised reasonable diligence in performing their various duties as police officers, judges, and public defenders.

306. Plaintiff alleges that he was unlawfully arrested by or on behalf of defendants Debra Ann Bertke/Adask, Stoll, Wilson, and Menefee without warrant or probable cause and maliciously, and Plaintiff was initially taken into custody against his will and under force of arms by both Wilson and Menefee without warrant or probable cause.

307. Plaintiff alleges that, as the result of the false arrest and the 344-day refusal to take him before a magistrate, Alfred Adask has suffered extreme humiliation and embarrassment, defamation of his character and reputation, loss of time, loss of earnings, future loss of earnings, severe mental anxiety and distress, and loss of his liberty and that Plaintiff was injured in the total amount of not less than $25,000.00 for each day of false imprisonment; and Plaintiff also alleges that defendants were malicious, and knowingly and willfully arrested Daniel, and intentionally refused to allow him effective counsel or an opportunity to be heard, and Plaintiff asks for exemplary damages in the amount of not less than $1,000,000.00 to be imposed on Defendants jointly and severally.

## COUNT IV

## TORTURE

308. Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 307 as if fully set forth herein and seeks to recover damages based upon a claim of torture.

309.  18 U.S.C. § 2340. Definitions, declares, "As used in this chapter -

"(1) "torture" means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control;

"(2) "severe mental pain or suffering" means the prolonged mental harm caused by or resulting from -

"(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

"(B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

"(C) the threat of imminent death; or

"(D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality; and

"(3) "United States" includes all areas under the jurisdiction of the United States including any of the places described in sections 5 and 7 of this title and section 46501(2) of title 49." [Emphasis added.]

310.  The United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, [annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984)], entered into force June 26, 1987, declares in part, at Article I Section 1:

"1. For the purposes of this Convention, the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

"2. This article is without prejudice to any international instrument or national legislation which does or may contain provisions of wider application." [Emphasis added.]

311.  The United States of America is a signatory to said United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

312. Defendants held Plaintiff, Alfred Adask, for 344 days for the purpose of "investigating" the allegations and/or presumption of an implied fiduciary relationship in CR302-3206 wherein Plaintiff was alleged by a single witness to have voluntarily consented to assume the role of fiduciary on behalf of the child Alexandra Nicole Adask .

313. Without probable cause (a second witness), subject matter jurisdiction over CR302-3206 (based on <u>void</u> CV 300-3086) or *in personam* jurisdiction over Alfred Adask, Defendants held Plaintiff, for purpose of coercing Plaintiff into taking a bond, taking a public defender, or otherwise unwittingly manifesting his "consent" to the court's jurisdiction and Debra Ann Bertke/Adask's legal theory of fiduciary relationship.

314. Defendants held Plaintiff for 344 days for the purpose of coercing plaintiff by means of threats of physical violence by inmates, disease conveyed by inmates, physically painful living and sleeping conditions, inadequate food, excessive stress, and fear of losing one's personal property and livelihood into unwittingly serving as the second witness to Debra Ann Bertke/Adask's claim against Plaintiff.

315. On September 30th, A.D. 2002, Plaintiff notified Wilson and Menafee that he was <u>not fiduciary</u> for any entity associated with CR302-3206.

316. Plaintiff waived extradition on express condition that he be extradited and received as a <u>non-fiduciary</u>.

317. Plaintiff, on information and belief, alleges that defendants were caught by surprise when Plaintiff appeared at JEFFERSON COUNTY MISSOURI JAIL in a non-fiduciary capacity and would not abandon that capacity.

318. Plaintiff, on information and belief, alleges that defendants, were unable to proceed to enforce the alleged child support "legal obligation" against Plaintiff without <u>Plaintiff's</u> express consent or implied assent to serve as second witness to the existence of the alleged parent-child fiduciary relationship.

319. Plaintiff, on information and belief, alleges that defendants, unable to proceed against Alfred Adask as a court-recognized non-fiduciary, determined to simply hold Plaintiff indefinitely in JEFFERSON COUNTRY MISSOUR JAIL in expectation that the mental and/or physical stress and pain of indefinite detention would soon cause Plaintiff to unwittingly manifest his assent to the existence of the parent-child, fiduciary relationship.

320. Plaintiff trusted our Father YHWH to preserve him through the physical and/or mental suffering associated with indefinite detention among a group of inmates who were sometimes violent or disease-ridden.

321. Plaintiff, on information and belief, alleges that on the 344th day of my false imprisonment, employee Wegge realized that, despite the mental and physical pain and suffering incurred by 344 days of false imprisonment, Plaintiff would not provide the second witness necessary for magistrate to find probable cause to issue an information on which authority Alfred Adask might be charged and tried.

322. On the 344th day of my false imprisonment, employee Wegge ordered that I be released without being charged, given a probable cause hearing, arraigned, tried, convicted or even having entered his court room.

323. Plaintiff alleges that the defendants' purpose for arresting me without warrant, extraditing me based on a private claim rather than an actual charge, and ultimately holding me for 344 days in maximum security was to coerce me into confessing or other providing information that was required for the prosecution to go forward in the matter of CR302-3206.

324. Plaintiff was thereby subjected to 344 days of torture.

325. Plaintiff demands $25,000.00 per day for each day that he was subjected to torture by defendants, plus $1,000,000.00 in exemplary damages to be imposed on Defendants jointly and severally.

WHEREFORE, Alfred Adask requests a judgment against Defendants for:

A.   Damages for Count I (RICO) in an amount to be determined at trial;

B.   Damages for Count II (Peonage) in the amount of $25,000.00 per day for each of 344 days plus $1,000,000.00 in exemplary damages.

C.   Damages for Count III (False Imprisonment) of $25,000.00 per day for each of the 344 days plus $1,000,000.00 in exemplary damages.

D.   Damages for Count IV (Torture) of $25,000.00 per day for each of the 344 days plus $1,000,000.00 in exemplary damages.

E.   Costs including, but not limited to, Court costs of this cause and those costs available under the law, including attorneys' fees and expenses; and

F.   Expungement of any and all unsubstantiated "criminal" records along with return of all fingerprints, records, and photographs of Alfred Adask that were taken or derived from my 344 days of false imprisonment.

G.   Such other and further relief as the Court deems just and proper.

DEMAND FOR JURY TRIAL

Alfred Adask hereby demands a jury trial on all claims so triable in this action.

Respectfully submitted.

At arm's length, without prejudice, only as above

By _____

Alfred Adask

972-202-7445   alfredadask@yahoo.com

c/o 2929 Robin Hill Lane

near N32°57.51816, W096°40.33212

The City of Garland [75044]

The County of Dallas

The State of Texas

The United States of America

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS–44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

*Alfred Adask*

*The City of Dallas*

**DEFENDANTS**

*Debra Ann Adask*

*JEFFERSON COUNTY MISSOURI*

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

RECEIVED

SEP – 7 2007

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

3 07 - C V 1 5 3 1 - P

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒1 | ☐1 | Incorporated or Principal Place of Business In This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☒2 | Incorporated and Principal Place of Business In Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☒ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☒ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product Liability | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **HABEAS CORPUS:** | | | Under Equal Access to Justice |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | or Defendant) | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS — Third Party | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | Security Act | 26 USC 7609 | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

*RICO 18 USC 1961 (1)(B)*

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY

JUDGE

DOCKET NUMBER

DATE
*September 7, AD 2007*

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____